[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 31, 2005
THOMAS  K. KAHN
CLERK

No.  03-13686

D. C. Docket No. 02-00036 CV-WCO-2

JANET M. HICKS,
a.k.a. Janet M. Bryant,

Plaintiff-Appellee,

versus

RICHARD MOORE, Individually and in his
Official Capacity as the Sheriff of Habersham County,
MICHAEL LONG,
BRIAN AUSBURN,
HABERSHAM COUNTY, GEORGIA,
JENNIE CLOUATRE,
JOSHUA HIGHFILL,
JOHN TAYLOR,
RUSSELL GOSNELL,

Defendants-Appellants,

JANE DOE, Individually, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 31, 2005)

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and EDENFIELD[*], District Judge.

EDMONDSON, Chief Judge:

This civil action for damages is, among other things, about a county jail's practice of strip searching all detainees who were to be placed in the general jail population -- regardless of whether reasonable suspicion existed for the search of a particular pretrial detainee. Because we are overcome by this Circuit's precedent, we must agree with the district court that such a general practice, for now at least, is an unlawful basis for the searches. But because the Plaintiff's strip search in this case was supported by reasonable suspicion, we conclude that Defendants are entitled to summary judgment on that ground and accordingly reverse, in part, the district court's decision.

Background

Plaintiff-Appellee Janet M. Hicks was arrested in April 2001 by a corporal of the Habersham County, Georgia, Sheriff's Department after a domestic dispute

---

[*]Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation.

with her estranged husband.[1]  After investigating at the scene, the Corporal determined that Plaintiff -- though exhibiting no violent behavior after the Corporal arrived -- was the chief aggressor and charged her with family violence battery.[2]  The Corporal took Plaintiff to the Habersham County Jail where he notified the jailers of the arrest charge and turned Plaintiff over to the custody of the jailers for processing.  No jailer who had contact with Plaintiff during her booking process testified that he suspected that Plaintiff was concealing weapons or contraband.

Plaintiff arrived at the Jail between 5:30 and 6:15 p.m., the time during which shift changes at the Jail occurred.  Coming on duty for the night shift at about the same time was Shift Corporal John Taylor and Jail Officer Joshua Highfill.  Also on duty from the day shift was Dispatcher Jennie Clouatre, who was to go off duty at about 6:30 p.m.

Upon Plaintiff's arrival, she was placed in a holding cell.  Plaintiff was allowed to come out of the cell to meet with her lawyer and was then put back in

---

[1]For this interlocutory appeal under 28 U.S.C. § 1983, we resolve all the properly disputed facts in accord with Plaintiff's version of the facts.

[2]Georgia defines family violence battery as "intentionally caus[ing] substantial physical harm or visible bodily harm" to a "past or present spouse[]." O.C.G.A. § 16-5-23.1(a), (f).  A first offense is a misdemeanor; a repeat offense is a felony. Id. § 16-5-23.1(f).  Plaintiff had never before been charged or arrested under § 16-5-23.1.

the holding cell. Corporal Taylor later retrieved Plaintiff from the cell; a woman then took Plaintiff into a bathroom to perform a strip search. Plaintiff believes the woman may have been Dispatcher Clouatre, but she is not sure.[3]

According to Plaintiff, Clouatre took Plaintiff into a windowless bathroom -- no one else was in the room -- and told her to disrobe, lift her breasts, and cough three times while squatting. Never did Clouatre, during the search, touch Plaintiff. The search lasted about five or six minutes. Plaintiff testified that Clouatre's demeanor was "[j]ust businesslike" and that Clouatre "was just doing her job." Clouatre testified that she does not remember Plaintiff in particular but that Clouatre, as a Dispatcher, has performed strip searches before at the request of the Shift Corporal when no female jailer was on duty. While Clouatre did not perform strip searches unless directed by the Shift Corporal, she understood the Jail's practice was to strip search everyone who came to be jailed regardless of the charge.

After the search, Plaintiff was photographed and fingerprinted by Officer Highfill.[4] According to Plaintiff, Officer Highfill instructed her to stand directly

---

[3]Defendants do not dispute that a strip search was performed on Plaintiff or offer an alternative to Clouatre. We will assume at this stage that Clouatre performed the strip search in this case.

[4]Taylor and Highfill both maintain that Taylor, not Highfill, fingerprinted Plaintiff. Plaintiff contends Highfill fingerprinted her, and we assume that to be true on summary judgment.

behind him while he pulled each arm around his body when making Plaintiff's fingerprints. Plaintiff testified Highfill explained to her that this method ensured a more accurate printing. Highfill pulled Plaintiff's arm around him with the rolling of each finger, causing Plaintiff's breasts and pelvis repeatedly to touch Highfill's back.

Plaintiff said she felt like she was being "toyed with" during the photograph and fingerprinting process. She offered two reasons: (1) she was scared and nervous, and she believed the officers could see that; and (2) the officers had made light of the requirement to photograph Plaintiff's scar as a precaution against a possible escape attempt. But as with Clouatre, Plaintiff testified that, during the fingerprinting, Highfill was "just doing his job" and "w[as not] mean to me." No officer in the Sheriff's department -- including Taylor or Highfill -- testified that he had ever fingerprinted a detainee by having a detainee stand directly behind the officer, and two officers testified that such a method was inadvisable because it put the officer at risk.

Corporal Taylor testified that, during the previous Sheriff's administration, he had questioned a superior officer about the Jail's blanket strip-search practice after Taylor learned at jail school that "we shouldn't strip search everybody that comes through the door." The superior had replied that he would look into it but

5

that they were to "fall back on department policy" and that he thought they "could get away with it." Officer Highfill also testified that he was instructed to strip search every detainee that was to be held in the Jail. All Defendants who testified said that the reason for such a practice was for the safety and security of the Jail Officers and the inmates.

Sheriff Richard Moore assumed the duties of his office in January 2001, at which time a written policy requiring reasonable suspicion for strip searches was in place at the Jail: a policy put there by a previous administration. Sheriff Moore testified that he did not read the policy upon taking office and that he delegated the day-to-day operations at the Jail -- including searches -- to the Jail Administrator, Captain Brian Ausburn. Sheriff Moore contends he was unaware of the blanket strip-search practice until a lawsuit about a strip search performed in the previous Sheriff's administration -- a suit filed in October 2001 (after the search in this case) -- prompted an investigation into the Jail's search practice. The spouse of the plaintiff in that earlier lawsuit complained in January 2001 (before the search in this case) to Sheriff Moore about the specific strip search in that case; and Sheriff Moore said he would look into the matter. Some testimony in the record indicates that Sheriff Moore had been in the immediate vicinity when jailers were preparing to strip search other detainees.

6

Captain Ausburn testified that he also was unaware that a general strip search practice was being followed at the Jail until he -- at the behest of Sheriff Moore upon the filing of the October 2001 lawsuit -- questioned jailers in the fall of 2001 about strip searches. Captain Ausburn discovered that a former administration's practice, requiring indiscriminate strip searches, had been continued under Sheriff Moore's tenure. Plaintiff contends Sheriff Moore did not instruct his deputies to stop the practice in the Jail until November 2001; that same month a pamphlet was distributed to jailers containing a "decision tree" to aid jailers in the determination of reasonable suspicion for strip searches.

Plaintiff brought both federal and state-law claims in this case, only a few of which are presented for review in this appeal. On her federal claims before this Court, Plaintiff contends that her Fourth Amendment rights were violated when she was strip searched pursuant to the Jail's general practice requiring the strip search -- without regard for particularized reasonable suspicion -- of all detainees to be housed in the Jail. Plaintiff brings this claim against Clouatre for performing the search, and against Sheriff Moore, Captain Ausburn and Sergeant Gosnell alleging supervisory liability for failure to train. Plaintiff further claims that Highfill violated her constitutional rights when he fingerprinted her in a way that

caused her body to be pulled against his during the process. The state-law claim in this appeal is an assault and battery claim against Highfill for the fingerprinting.

The district court concluded that the indiscriminate strip-search practice at the Jail was unconstitutional under our Circuit's decision in Wilson v. Jones, 251 F.3d 1340 (11th Cir. 2001), and also concluded that the circumstances here did not support a determination of reasonable suspicion for the strip search performed on Plaintiff specifically. The district court denied qualified immunity to Clouatre on the strip search itself and denied qualified immunity to Moore, Ausburn and Gosnell on the failure-to-train claim. The court also denied qualified immunity to Highfill on the federal claim for the fingerprinting and denied Highfill official immunity on the state-law assault and battery claim for the fingerprinting. Defendants took an interlocutory appeal on the denial of immunity.

Discussion

I. Federal Claims

When we consider the question of entitlement to qualified immunity, we first ordinarily ask whether the Constitution was violated at all.

A.  The Strip Search.

Plaintiff contends Clouatre (pursuant to the Jail's practice) violated Plaintiff's rights under the Fourth Amendment by strip searching her without reasonable suspicion.  She also claims that Sheriff Moore, Captain Ausburn, and Sergeant Gosnell are liable to her based on a theory of supervisory liability because they failed to train jailers properly about when to conduct strip searches, instead adhering to the general practice that required strip searches of all detainees regardless of the charge or circumstances.

We will assume that it was the practice of Habersham County to strip search every detainee who was to be placed in the general population of the Jail.[5]  And given the Circuit's precedent, we must conclude the search of Plaintiff cannot be

---

[5]We personally question that such a practice violates the Fourth Amendment.  See Evans v. Stephens, 407 F.3d 1272, 1278-79 (11th Cir. 2005) (en banc) ("Most of us are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching -- for security and safety purposes -- arrestees bound for the general jail population. . . .  Never has the Supreme Court imposed such a requirement.").  For background, see Evans, 407 F.3d at 1284-96 (Carnes, J., concurring specially, joined by Dubina and Hull, JJ.).  But we accept that "reasonable suspicion" is required by the law of the Circuit.

9

justified under the Constitution on the single ground that Plaintiff was about to be placed in the Jail's general population. See Wilson v. Jones, 251 F.3d 1340, 1341, 1343 (11th Cir. 2001).

That conclusion, however, does not mean that Plaintiff's own constitutional rights were violated when she was searched: just because she was strip searched at a jail that had a search practice that would generally violate the Constitution does not mean every search that was conducted actually violated the Constitution. Skurstenis v. Jones, 236 F.3d 678, 682 (11th Cir. 2000). We said in Skurstenis that "'reasonable suspicion' may justify a strip search of a pretrial detainee." Id. Because we conclude that reasonable suspicion existed for this particular strip search, we also must conclude that no constitutional right was violated by the search.

"Whether an officer has a reasonable suspicion is an objective question viewed from the standpoint of a reasonable [] officer at the scene. It is based on the totality of the circumstances, and is a question of law to be reviewed de novo." Evans, 407 F.3d at 1280 (citations omitted).

Plaintiff was arrested and charged with family violence battery under O.C.G.A. § 16-5-23.1, the elements of which are "intentionally caus[ing] substantial physical harm or visible bodily harm" to a "past or present spouse." Id.

§ 16-5-23.1(a), (f). This crime is obviously one of violence. We accept that a person's being charged with a crime of violence is sufficient to evoke reasonable suspicion that the person may be concealing weapons or contraband. Accord Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989) ("It is objectively reasonable to conduct a strip search of one charged with a crime of violence before that person comes into contact with other inmates.").

We know that both the arresting officer and the jail shift supervisor testified that they -- based on their interactions with Plaintiff that evening -- did not subjectively suspect Plaintiff of possessing weapons or drugs. But whether reasonable suspicion existed at the time is a question of law to be determined ultimately by judges, not policemen or jailers. And the question we are faced with here is not whether a specific arresting officer or jailer actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search. That no one, at the time, actually conducted a "reasonable suspicion" analysis is unimportant to whether reasonable suspicion objectively existed, given the circumstances. The subjective intentions and beliefs of the jailers conducting the strip search "are immaterial to the Fourth Amendment analysis." Evans, 407 F.3d at 1280 n.9, citing Graham v. Connor, 109 S.Ct. 1865, 1872 (1989).

11

Plaintiff argues that the three cases cited by Defendants, Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962 (11th Cir. 2002); Skurstenis, 236 F.3d at 678; and Justice v. Peachtree City, 961 F.2d 188 (11th Cir. 1992), are inapposite to whether Clouatre had reasonable suspicion to strip search Plaintiff based solely on an arrest charge:  in those cases, this Court considered circumstances other than the arrest charge in determining that reasonable suspicion existed for the strip searches.  Cuesta, 285 F.3d at 970-71 (violent and hateful language in pamphlets distributed by school children included in arrest affidavit); Skurstenis, 236 F.3d at 682 (.38 revolver in car at time of arrest); Justice, 961 F.2d at 194 (suspicious drug-related activity at time of arrest made in drug-related location).

We agree that those cases are not controlling, but for another reason:  none of those cases involved an arrest for an obvious crime of violence.  Cuesta, 285 F.3d at 965 (plaintiff charged with distributing publications that "tend to expose persons to hatred, contempt, or ridicule"); Skurstenis, 236 F.3d at 680 (plaintiff charged with DUI); Justice, 961 F.2d at 190 (plaintiff charged with loitering and truancy).

We conclude that the strip search performed on Plaintiff violated no constitutional right.[6] Accordingly, we reverse the judgment of the district court denying summary judgment to Clouatre. Because we conclude that Plaintiff's constitutional rights were not violated by the search, Plaintiff cannot maintain a § 1983 action for supervisory liability against Sheriff Moore, Captain Ausburn, or Sergeant Gosnell for failure to train. Rooney v. Watson, 101 F.3d 1378, 1381 n.2 (11th Cir. 1996). We also reverse the district court's denial of summary judgment to Moore, Ausburn and Gosnell on that basis.

B. The Fingerprinting.

Plaintiff claims her Fourth Amendment rights were violated when Officer Highfill fingerprinted her in a way that caused her body repeatedly to be pressed against Highfill's back. In her brief, Plaintiff contends Highfill's acts violated the Fourth Amendment; the brief says that it is an obvious violation of the Fourth Amendment to "fondle," "grope" and "sexually assault" a pretrial detainee. But in her complaint and deposition, Plaintiff herself never used such words and does not

---

[6]Plaintiff does not argue that this search was performed in an abusive manner, and we see no evidence of abuse in the record. Cf. Evans, 407 F.3d at 1281.

13

hint at sexual impropriety on Highfill's part; she describes Highfill's conduct during the fingerprinting process as "just doing his job" and that Highfill "w[as not] mean to me." For example, no sexual language (or even sexually suggestive language) accompanied the fingerprinting.

After the dust has settled on this claim, what remains is that Plaintiff -- an adult who was always fully clothed -- was uncomfortable when she was being fingerprinted because her body was pulled into the back of Officer Highfill with the rolling of each finger. Plaintiff, at the time, said nothing about her discomfort; nor did she claim -- then or in her complaint, deposition or brief -- that she was hurt or injured physically.

We acknowledge that a Fourth Amendment[7] violation can occur without much force being applied during a seizure. The Amendment protects people from "unreasonable" seizures, and "unreasonable" contemplates "more than the

---

[7]"Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause," and require a showing of deliberate indifference to a substantial risk of serious harm. Cottrell v. Caldwell, 85 F.3d 1480, 1490 (1996). Plaintiff asserts protection under the Fourth Amendment standard, which is commonly an easier standard for a plaintiff to meet. At the time of the fingerprinting, Plaintiff had already been arrested, delivered to the Jail, and had begun -- but not completed -- the booking process. The original arresting officer had turned Plaintiff over to jailers, and he was not present during and did not participate in the events underlying the complaint. The precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment) is not settled in this Circuit. We underline that Defendants never argue that the strip search or fingerprinting was separate from Plaintiff's seizure; so we -- will assume (for this case) Plaintiff was still being seized and -- analyze the claim under the Fourth Amendment.

14

unnecessary strike of a nightstick, sting of a bullet, [or] thud of a boot." Fontana v. Haskin, 262 F.3d 871, 878 (9th Cir. 2001) (concluding police officer's "sexual verbal and physical predation against a handcuffed arrestee" on ride to police station was Fourth Amendment violation). Apart from excessive force, we recognize that "harassing and abusive behavior" by an officer towards a detainee during a seizure can, in some cases, rise to the level of "unreasonable" for Fourth Amendment purposes. See id. at 879. But we stress that not every intrusion, touching, discomfort or embarrassment during an arrest is actionable as a violation of the Fourth Amendment. Some of these acts may be provably accidental or just too insignificant and thus within the range of the constitutionally reasonable. Id. at 880; cf. Vinyard v. Wilson, 311 F.3d 1340, 1344, 1348 n.13 (11th Cir. 2002) (concluding de minimis force when officer dragged plaintiff inside jail, following arrest, "either by her shirt, her arm, or her hair"); Jones v. City of Dothan, Ala., 121 F.3d 1456, 1460 (11th Cir. 1997) (concluding de minimis force when officers "slammed" plaintiff against wall). We conclude that the pertinent fingerprinting conduct is of that nature.

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." Schmerber v. California, 86 S.Ct. 1826, 1834 (1966). We accept that Plaintiff was

15

uncomfortable with the fingerprinting process when she was touching the back of Officer Highfill with her body. We also accept that Officer Highfill's subjective intentions are unimportant in determining whether the complained-of touching was -- objectively -- too much of an affront to Plaintiff's personal privacy and dignity in a constitutional sense and, therefore, unreasonable under the Fourth Amendment. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Railway Labor Executives' Ass'n, 109 S.Ct. 1402, 1414 (1989) (internal quotation marks omitted). We conclude that the touching complained of by Plaintiff -- given the business-like circumstances surrounding the fingerprinting of an arrested person and the limited and coincidental nature of the touching -- was too slight and was within the outside borders of what is reasonable under the Fourth Amendment.

II. State-Law Claim

Plaintiff also brought a claim against Officer Highfill under Georgia law for assault and battery for the fingerprinting. Highfill denies ever using the

16

fingerprinting method alleged and denies altogether taking Plaintiff's fingerprints. The district court properly left this factual dispute for a jury to decide.

We affirm the district court's denial of state-law official immunity to Officer Highfill on this state-law claim. The Georgia Constitution immunizes state officials from suit for conduct performed in the line of duty if their acts are (1) discretionary and done without malice; or (2) ministerial and done without negligence. Ga. Const. art. I, § 2, ¶ 9(d) (amended 1991). Although the jury in this case may ultimately decide the facts differently, we conclude that evidence is in the record to support a finding -- assuming at this stage that Highfill was the one that fingerprinted Plaintiff -- that Highfill acted with malice (Plaintiff said she felt "toyed with" during the booking process) and acted negligently (officers testified that the fingerprinting method used was inadvisable). Reading the record in Plaintiff's favor, whether Highfill's fingerprinting of Plaintiff in the manner alleged was discretionary or ministerial makes no difference; official immunity would protect him in neither case. Accordingly, Highfill is not entitled to summary judgment on this claim.

Conclusion

Given the circumstances, we see no constitutional violation in Plaintiff's strip search. So, we reverse the denial of summary judgment to Dispatcher Clouatre on the Fourth Amendment claim; and we reverse the denial of summary judgment to Sheriff Moore, Captain Ausburn and Sergeant Gosnell on the supervisory liability claim. Given the circumstances, the contact with Plaintiff during the fingerprinting process was too slight to amount to a constitutional violation; so, we reverse the denial of summary judgment to Officer Highfill on this federal claim.

We affirm the denial of state-law official immunity to Officer Highfill on the assault and battery claim for the fingerprinting.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.[8]

---

[8]Today's decision, in effect, eliminates all federal claims in this case, leaving only Plaintiff's state-law claims. We allow the district court to exercise its discretion, under the Gibbs doctrine, to decide whether or not to consider Plaintiff's state-law claims on remand. See United Mine Workers of America v. Gibbs, 86 S.Ct. 1130, 1139 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.") (citation omitted).

18